## Mellon Bank v. The Trend Group, Ltd.

*Louis J. Sinatra,* for Mellon Bank.
*William J. Brennan,* for The Trend Group.

BROWN, *J.,* January 8, 1986—In this factually complex commercial litigation, defendant, the Trend Group Limited, (Trend) seeks to have this Court open or strike a judgment by confession en-

tered by plaintiff, Mellon Bank (East) National Association[1] (bank). On August 1, 1984 the bank confessed judgment against Trend on a promissory note in the amount of $717,444.13.[2] The note was executed by Trend on June 17, 1983 and secured part of an international financing arrangement wherein Trend Export Funding Company (TEFCO), a wholly owned subsidiary of Trend, contracted with a party in the Hashemite Kingdom of Jordan for the sale and delivery of certain heavy construction equipment. Trend filed a petition to open or strike on September 5, 1984, alleging that the confession of judgment complaint was defective in that it was not verified in the presence of a notary public. The petition also alleged that the judgment note was not assignable.[3] On September 14, 1984, the bank filed a petition seeking to amend its complaint to correct the defective notarization.[4]

On December 4, 1985, Trend filed a petition to amend the petition to open or strike.[5] In that petition Trend alleges the bank negligently mishandled

---

1. At all times relevant Mellon Bank was known as Girard International Bank.

2. The amount of note was $700,000, the balance at default was $650,000. The remainder represents interest and counsel fees.

3. Trend withdrew this issue in court on December 11, 1984.

4. We view this as a hyper-technical defect for which an amendment is unnecessary. Monroe Contract Corporation v. Harrison Square, Inc., 266 Pa. Super. 549, 405 A.2d 954 (1979).

5. The withdrawal noted in footnote 3 and our disposition of the notarization issue resolves the Strike issues since they are the only record defects charged. J. F. Realty Co. v. Yerkes, 263 Pa. Super. 436, 398 A.2d 215 (1979). DeFeo v. MacIntyre, 265 Pa. Super. 95, 401 A.2d 818 (1979).

certain security documents resulting in the construction equipment being delivered without the buyer first signing the documents. The petition also alleges the bank manipulated maturity dates on certain notes which resulted in defenses being raised by the insurance company which insured the transaction.[6] The petition seeks legal fees, travel and miscellaneous expenses. The hearing began on December 11, 1984. Additional testimony was taken on January 14 and 16, February 27, and 28 and March 4 and 5, 1985. The parties were also directed to argue one of the issues and this took place on August 27, 1985.

During the course of the hearing Trend raised three additional defenses which were not mentioned in the first petition or in the petition to amend. It claims it did not learn of the information that supports these defenses until after filing the petition to amend. First, it claims the bank coerced Jeffrey Rafsky, President and Chairman of the Board of Trend to sign the note at issue on behalf of Trend at a meeting held on June 16 and 17, 1983. Second, it contends the bank had a duty to inform Rafsky, before he signed the note, that a previous note securing the same transaction was purchased by the bank 90 percent without recourse to TEFCO.

Finally, Trend claims the bank breached its duty under §4-501 of the Uniform Commercial Code[7] and committed fraud in failing to notify Rafsky, before the execution of the June 17 note, that the purchaser of the equipment in Jordan had refused to

---

6. Trend presented no evidence on this issue; thus, we treat it as waived.

7. This section is codified in Pennsylvania at 13 Pa. C.S. §4501.

sign a promissory note and pay a sight draft presented by the bank's correspondent in Jordan.

Trend is a financial service organization involved in equipment lease financing, both domestically and internationally, in addition to other types of financing. TEFCO, as noted above, is a subsidiary of Trend. On April 14, 1982, TEFCO obtained a master policy of export insurance from the Foreign Credit Insurance Association (FCIA)[8] with respect to the sale of heavy construction equipment. On September 1, 1982, TEFCO obtained a non-acceptance endorsement to its FCIA master policy which provided coverage against a loss caused by failure or refusal of a foreign buyer to accept shipment of goods. In November of 1982, officers of TEFCO met with Mr. Yousef F. Jashan (Jashan), a road building contractor in Jordan, and after negotiation agreed to sell and deliver to him at the port of Aquaba, in Jordan, the heavy construction equipment in question. The sale totalled $1,529,391, conditional upon approval by the FCIA. The sale was approved and FCIA provided coverage against non-acceptance of the merchandise.

In an effort to secure financing for the transaction, TEFCO contacted Girard International Bank (bank). It agreed to extend TEFCO a $2,500,000 line of credit. As part of the agreement the bank was to process the collection of all payments to be made by Jashan. During negotiations with TEFCO, Jashan executed a power of attorney in favor of Steven R. Michaels, and Philip T. Amico, President and Vice-President respectively. Both Michaels and Amico later executed a promissory note dated April

---

8. The FCIA is a group of insurance companies in association with the U.S. Government which insures American goods shipped overseas.

1, 1983 as attorneys-in-fact, obligating Jashan to pay TEFCO the sum of $1,529,391. On that same date TEFCO forwarded to the bank certain collection documents which included a sight draft for $106,427.67. The draft represented TEFCO's commission on the transaction.

The form sight draft included instructions for the bank to present the documents through Jordan Securities[9] (Jordan). In addition to other instructions, the bank was directed to contact Philip T. Amico in case of need. The bank was further directed under a special instructions section, to "please have Yousef Jashan acknowledge the note by signing as the President and as the personal guarantor of the obligation. Have bank (Jordan) release documents *only* upon signing of the note and payment of the sight draft. Please have bank (Jordan) return signed note." The bank forwarded the collection documents, with various instructions, to Jordan on April 18, 1983. Jordan was directed to "pls have Yousef Jashan (sic) acknowledge the note by singing as the President and as the personal guarantor of the obligation. Release documents *only* upon signing of the note *and* payment of the sight draft. Pls return the signed note to us. Pls remit funds to us via telegraphic transfer through your New York correspondent under cable advice to us."

On May 4, 1983, TEFCO executed a "specific transactional request" wherein it requested the Bank to purchase, 90 percent without recourse, $700,000 of the Jashan obligation. The request incorporated by reference a short term Hold Harmless Agreement executed by TEFCO on April 8, 1983. By the Hold Harmless Agreement TEFCO request-

---

9. Jordan Securities was acting as the bank's correspondent for this collection.

ed the bank to purchase from time to time unpaid drafts, with the insured percentage without recourse. By the request TEFCO assigned the Bank $700,000 of its coverage under the FCIA insurance policy. Under the Hold Harmless Agreement TEFCO agreed to hold the bank harmless for losses occurring from any of five stated causes.[10] The

10. The agreement is titled "Short-Term Hold Harmless Agreement Under FCIA Export Credit Insurance Policy" and provides in part:

"The undersigned, Trend Export Funding Corp., (hereinafter called the "Exporter"), hereby requests you to purchase from time to time 100 percent of the unpaid amount of the draft or drafts (hereinafter called the "drafts") with the insured percentage of the drafts purchased without recourse.

The Exporter warrants that repayment of drafts is insured under policy no. CMR 20075 issued by the Foreign Credit Insurance Association and that the Exporter has assigned to you its rights to amounts payable under said policy in accordance with the attached assignment.

.   .   .

IV. UNDERTAKING TO HOLD HARMLESS The Exporter will hold you harmless for any loss which is:

(A) due to the fault of the Exporter or its agent or agents;

(B) excluded from or not covered by the policy issued by the Insurers;

(C) due to any misrepresentation by the Exporter or its agent or agents of a material fact, or the breach by the Exporter or its agent or agents of any express or implied warranty made in this agreement or in connection with the transaction with the purchaser;

(D) due to any reduction in the amount paid on any claim or claims under the applicable policy made pursuant to paragraph D of article III thereof;

(E) due to any other failure of the insurers to pay a loss attributable to the insured portion of the draft.

The Exporter also agrees to use all reasonable and usual care and skill and take all practicable measures which may be required by you to prevent or minimize a loss to you in connection with this transaction."

equipment which was the subject of the sale was delivered to the port of Aquaba in mid-March of 1983. It was released from the dock and came into Jashan's possession in April 1983 without his signature first being obtained on the promissory note or payment made on the sight draft.

On June 8, 1983, believing that other transactions involving TEFCO in England and West Germany were fraudulent, the bank brought civil actions in the District Court in New York and Connecticut. On June 9, the bank obtained ex parte orders of attachment and levied upon various bank accounts of Trend and TEFCO, effectively halting their business operations.

On June 12, Jordan notified the bank that Jashan had refused to sign the promissory note or pay the sight draft.

A meeting was held at the bank's offices in Philadelphia on June 16, to discuss the suspect transactions and resolve matters so the attachments could be lifted. In attendance at the meeting were Jeffrey Rafsky, Fred Blume, Esq., and Roger Cox, Esq. for Trend, and Irwin Warren, Esq., Andrew Melnick, Esq., John York, Esq., Steven Kaplan, Esq., and Wesley Winfree, for the bank. During the meeting, which began on the afternoon of the 16th and carried over into the early morning hours of the 17th, Rafsky and Blume were told that the bank believed certain TEFCO transactions in England and West Germany were fraudulent. Trend agreed to pay the full indebtedness on them. The bank also questioned the genuiness of the Jashan transaction, although never explicitly mentioning that Jashan had refused to sign the note and pay the sight draft. After extensive negotiations, Rafsky, on behalf of Trend, executed a promissory note in favor of the Bank for $700,000, thereby vitiating the specific

transactional request executed on May 4, and transforming a 90 percent without recourse obligation into a 100 percent recourse obligation.[11] In addition, the bank required a personal guarantee of the transaction by Rafsky and directed Trend to obtain a promissory note signed personally by Jashan. In December, 1983 Jashan signed such a note. Trend defaulted on the June 17, 1983 note, and judgment was confessed by the bank.

As noted earlier, Trend contends in its petition to amend that the bank was negligent in failing to obtain Jashan's signature on the promissory note and obtain payment of the sight draft before Jashan acquired possession of the equipment. The only other charge in the amended petition was that Girard had changed or manipulated maturity dates on certain Trend notes and as a result defenses were raised by FCIA. No evidence in support was ever presented.

During the course of the hearings Trend raised three additional issues:

(1) that Rafsky was coerced into signing the note of June 17.

(2) that the bank was under a duty to disclose to Rafsky and Blume, before Rafsky executed the promissory note at the meeting on June 17, that the Specific Transactional Request executed by TEFCO's officers in May of 1983 was 90 percent without recourse.

(3) finally, that the Bank breached its duty under §4-501 of the Uniform Commercial Code[12] in fail-

---

11. This assumes, of course, the occurrence of no event bringing the hold harmless provision into effect. If one or more of them occurred, that transformed the original obligation to 100 percent recourse.

12. That section provides:

"UCC §4-501. Handling of Documentary Drafts; Duty to send for Presentment and to Notify Customer of Dishonor.

ing to give notice of Jashan's refusal to sign the promissory note and sight draft and thereby fraudulently induced Rafsky to sign the note at issue. Trend claims the note of June 17 would not have been executed had it known of Jashan's refusal to sign the note and pay the draft presented in Jordan.

These defenses were not pleaded in either the petition to open filed on September 5, nor in the petition to amend filed on December 4, 1984. Trend's explanation is that the supporting evidence did not come to light until after both petitions were filed.[13] The bank objected; however, we decided to hear the evidence and rule on its admissibility later.

Rule of Civil Procedure 2959 concerned with pleadings and procedure in the striking off or opening of judgments, reads in part as follows:

"(a) relief from a judgment by confession shall be sought by petition. All grounds for relief, whether to strike off the judgment or to open it, must be asserted in a single petition. . . .

(c) A party waives all defenses and objections which he does not include in his petition or answer."

Our research discloses little authority annotating the "All grounds . . . in a single petition" of 2959(a) or the waiver provision of (c). What little authority there is, appellate or otherwise, supports plaintiff's

---

A bank which takes a documentary draft for collection must present or send the draft and accompanying documents for presentment and upon learning that the draft has not been paid or accepted in due course must seasonably notify its customer of such fact even though it may have discounted or bought the draft or extended credit available for withdrawal as of right."

13. The evidence was the telex received by the bank from Jordan on June 12, 1983 stating that Jashan had refused to sign the note or pay the draft.

position that issues not raised in the petition or its amendment are not admissible. Wolgin v. Mickman, 233 Pa. Super. 218, 335 A.2d 824 (1975), Exxon Corporation v. Witmer, 71 Berks 144 (1978), James v. McLaughlin, 20 Adams 116 (1978).

Quite apart from the application of the waiver rule, an examination of defendant's evidence shows beyond question that none of them were unknown to the defendant even at the time the first petition was filed, so that the claim that it was learning more and more as the case progressed during the hearing simply does not hold up under scrutiny. As to the first, if Jeffrey Rafsky was coerced into signing the note early on the morning of June 17, 1983, he surely knew of that coercion at that time. No one can be coerced without knowing of the coercion so there was hardly any excuse for not having raised that issue in the first petition filed in September of 1984 and much less for the failure to make mention of it in the December petition to amend.

As to the second claim that the bank was under a duty to disclose the 90 percent without recourse aspect of the earlier note, there was no evidence that the representatives of the bank misrepresented the recourse aspects of the earlier note and it certainly had a right to assume that the chief executive officer of defendants was acquainted with the basics concerning his company's obligations especially since the May, 1983 note was not unusual, but a typical without recourse note, the like of which his companies routinely executed in their many banking transactions. Furthermore, just as in the case of the claim of coercion, the without recourse aspect of the obligation was known to Rafsky many months before the filing of the September petition. That was made clear from the testimony of TEFCO's president, Steven R. Michaels, who made specific men-

tion of it to Rafsky during the summer of 1983.

The last unpleaded claim is that the bank breached its duty under §4-501 of the Uniform Commercial Code by failing to give notice of Jashan's dishonor of the note and by reason of that failure induced Rafsky to execute the note of June 17.

Not only does the evidence support the conclusion that Rafsky and the other officers of the defendant corporation knew months in advance of the filing of the September, 1984 petition to open that Jashan had refused to sign the note, but it appears that they knew during or before the June 16-17 meeting that Jashan had done so. The following dialogue took place during the cross-examination of Philip Amico, Vice-President of TEFCO, at the time of these transactions.

"Q. In the conferences that you had with Mr. Rafsky with respect to Jahshan, did you ever tell him that there was a problem with respect to the execution and delivery of a note from Jahshan to your company?

A. I told him that there had been a problem, that we had not heard from the Bank since we gave the Bank the documents, we had not received the signed promissory note. But that, on the other hand, it was not unusual to be that long a delay. This is obviously before litigation.

Q. Right. When did you tell Mr. Rafsky — when do you first recall telling Mr. Rafsky that there was some difficulty with respect to the documentary collection?

A. I probably — the first week in June, between the first ten days.

Q. In 1983?

A. Yeah."

Furthermore, during re-direct examination Rafsky was asked what circumstances surrounded the bank's request that Trend obtain a note signed by Jashan. His response was as follows:

"A. The evening of June 16 and 17, the Bank said that although they had the note, which is 5-C in the Exhibit package, as executed by Michaels and Amico, and although there was no question as to its applicability in terms of the FCIA cover, they wanted a second note in this form and substance executed by Jahshan in turn to us, and therefore, turned over to them."

By this statement he admitted the bank implicitly informed him that the note presented to Jashan had not been signed. Why else would the bank insist that he get a note signed by Jashan but that Jashan had not executed one. If he believed the note had been executed he surely would have questioned the bank's insistence that he see to its execution, especially before agreeing to personally guarantee the transaction. However, there was no testimony presented by either party of any such discussion. If Rafsky was not aware of Jashan's dishonor in the first week to ten days of June he was surely aware of it by the time the meeting ended on June 17.

Thus it is clear that not only have the unpleaded defenses been waived under Pa. R.C.P. 2959(c) but the defendant has failed to produce evidence "which in a jury trial would require the issues to be submitted to the jury" within the meaning of subsection (e) of that rule.

The issue preserved in the amended petition concerns the charge that the bank was responsible for the execution of the documents in Jordan by Jashan and that by reason of its negligent failure to do so, the defendant has a set-off against the judgment. In addition to the unliquidated claim for damages as a

result of this negligence, Trend includes in its set-off the loss of the commission, legal fees, travel and miscellaneous expenses of its officers, and a sum in excess of $40,000 paid to an official in the Middle East for assistance in getting Jashan's signature on the note in December, 1983. Whether the bank was negligent, or indeed if it had any of the duties urged on us by defendant need not concern us in this proceeding, for an unliquidated set-off cannot be asserted as a ground for opening a confessed judgment. Nadolny v. Scoratow, 412 Pa. 488, 195 A.2d 87 (1963). The indebtedness here is in consideration for the bank loaning the money, not for assuming the responsibility of obtaining the execution of the security documents. While one judgment may be set off against another, certainly a mere claim unliquidated and unresolved cannot be a set off against a judgment presumably ripe for execution. Harrison v. Stoeckert, 369 Pa. 143, 85 A.2d 154 (1952). This is not to suggest, of course, that the defendant is without a remedy. If indeed the bank did breach its duty, then a separate action may be brought on that cause of action.

## ORDER

And now, this January 8, 1986, defendant, The Trend Group, Limited's petition to strike and/or open the judgment entered by confession on August 1, 1984 by Mellon Bank (East) N.A. is dismissed.

